**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

Joshua Daubenspeck,

               Plaintiff,

v.

Textron Aviation Incorporated,

               Defendant.

No. CV-20-00465-PHX-ROS

**ORDER**

Defendant Textron Aviation Inc. employed Plaintiff Joshua Daubenspeck, an officer in the United States Coast Guard Reserve, (Doc. 1 at 3), from October 2015 to July 2019. (Doc. 48 at 1, 9). On July 27, 2019, Defendant terminated Plaintiff's employment as Regional Sales Director. (Doc. 47 at 7). Plaintiff subsequently filed this suit, asserting the termination was motivated by his obligations to the Coast Guard Reserve in violation of the Uniformed Services Employment and Reemployment Rights Act (USERRA), 38 U.S.C. § 4301, *et seq.*, and a similar Arizona statute, codified at A.R.S. §§ 23-1501 and 26-168. (Doc. 1 at 4-6). Defendant contends it terminated Plaintiff's employment due to Plaintiff's inadequate performance as sales director, not as a result of Plaintiff's service in the Coast Guard Reserve. (Doc. 47 at 7). Summary judgment will be denied on both claims.

## BACKGROUND

Unless otherwise noted, the following facts are undisputed. Plaintiff Joshua Daubenspeck ("Daubenspeck") served in the United States Coast Guard for over fourteen

years.  (Doc. 1 at 3).  At all times relevant to this suit, he was a Lieutenant Commander in the Coast Guard Reserve. (Doc. 1 at 3).  In October 2015, Defendant Textron Aviation Incorporated ("Textron") hired Daubenspeck as a Regional Sales Associate responsible for generating leads that could lead to airplane sales.  (Doc. 48 at 1).  At the time of his hiring, Daubenspeck disclosed his status as an officer in the Coast Guard Reserve to his then-supervisor, William Harris.  (Doc. 48 at 1).  Harris responded favorably to Daubenspeck's military commitments.  (Doc. 48 at 1).  In January 2017, Daubenspeck was promoted to Regional Sales Director and relocated from Manhattan Beach, California to Scottsdale, Arizona.  (Doc. 51 at 2).

Steve Sperley replaced Harris as Daubenspeck's supervisor in November 2018. (Doc. 48 at 3).  Daubenspeck informed Sperley about his Coast Guard Reserve status and his associated duties at the time Sperley assumed his role as Daubenspeck's supervisor. (Doc. 48 at 3).

While employed with Textron, Daubenspeck participated in monthly drills with the Coast Guard Reserve that occupied one weekend per month and, in each year prior to 2019, he performed a two-week active duty service commitment with the Coast Guard.  (Doc. 48 at 2).  The parties agree, "Daubenspeck experienced no problems from Textron regarding his Coast Guard duties in 2017 and 2018" and "Daubenspeck's duties with the Coast Guard Reserve did not impact his performance at Textron."  (Doc. 48 at 2-3).

Each year, Harris or Sperley gave Daubenspeck a sales quota he was expected to meet.  In 2017, Daubenspeck sold five aircraft against a quota of four.  (Doc. 51 at 2).  The sales in that year were made on May 12, June 28, September 18, September 23, December 28.  (Doc. 52 at 9).  In 2018, Daubenspeck sold four aircraft against a quota of five.  (Doc. 48 at 2).  Those sales were completed on July 13, August 3, September 25, and September 27.  (Doc. 48 at 7).  In 2019, Daubenspeck had a quota of five airplane sales.  (Doc. 48 at 3).

On February 20, 2019, President Donald J. Trump issued Proclamation 9844 "Declaring a National Emergency Concerning the Southern Border of the United States."

84 Fed.Reg. 4949.  On June 7, 2019, Daubenspeck was notified he would be mobilized to active duty to the U.S. border in support of President Trump's declaration. (Doc. 1 at 3). Daubenspeck spoke with Sperley regarding his upcoming deployment on June 7 and, on June 10, emailed Sperley and Danielle Cooper of Textron's Human Resources department explaining that he would be deployed from August 13 to October 11, 2019.  (Doc. 48 at 5).

According to Daubenspeck, after he notified Sperley of his upcoming deployment, "the tone of all conversations and dialogue with Mr. Sperley turned particularly critical and focused on negative consequences."  (Doc. 52-2 at 4).  When Daubenspeck first told Sperley of his service obligations, Daubenspeck claims to have had the "immediate impression that Mr. Sperley had an unfavorable view of Mr. Daubenspeck's service in the Coast Guard."  (Doc. 51 at 3; Doc. 52-2 at 3).  In his declaration, Daubenspeck explains Sperley's questions involved whether service in the Coast Guard would mean Daubenspeck was unavailable for "customer engagement and outreach" or if he would be "off the grid and unresponsive." (Doc. 52-2 at 3).  Beyond Daubenspeck's recital of Sperley's reaction, Daubenspeck offers two pieces of documentary evidence in support of his assertion that his relationship with Sperley soured because of his military commitments.

First, Daubenspeck notes the tone of comments in his internal "Performance Management Profile" changed after he notified Sperley of his deployment:

> On June 3, 2019, before he was aware of Mr. Daubenspeck's upcoming deployment, Mr. Sperley noted, "Josh continues to seek opportunities to both learn from his peers and obtain feedback from his RVP. Additionally, Josh is working from a combined RSD/RSA sales plan that will provide a structure from which to improve his effectiveness." But then, on July 3, 2019, after learning of Mr. Daubenspeck's upcoming deployment, Mr. Sperley concluded, "While Josh puts forward a lot of energy, his communication, technical, and business acumen skills are lacking. Josh is has [sic] been underperforming in 2019."

(Doc. 51 at 8 quoting Doc. 52-2 at 17-18).  For its part, Textron argues Daubenspeck takes the comments out of context.  (Doc. 53 at 4-5).  It says the June 3 comment appeared "under the heading 'Development Plan'" which it suggests "clearly related to how Textron is expecting Daubenspeck to develop as a salesperson—obviously, that expectation would never be negative."  (Doc. 53 at 5).  The July 3 comment Daubenspeck cites came under a

"General Summary" heading, "which was visible only to Sperley, not Daubenspeck." (Doc. 53 at 5).  Textron notes there were no prior comments in the General Summary section, which it suggests means that "Daubenspeck's inference that Sperley was suddenly flip-flopping from positive to negative comments after learning of the upcoming deployment is not reasonable." (Doc. 53 at 5).  It also notes that, under the Development heading, Sperley on July 3 described Daubenspeck in relatively positive terms.  (Doc. 53 at 5).

Second, Daubenspeck points to a July 9 email sent by Zachary Lyons, a Textron human resources partner.  In the email, Lyons wrote: "Josh did not produce a sale through the end of quarter. Performance discussion about needing to see sales results. Manager set multiple goals including that he expects Josh to sell 2 aircrafts within 30 days (by July 24th) which Josh has not made any progress towards.  Josh also sent e-mail to manager on June 10th saying he will be required to join coast guard between August 13th-October 11[th]." (Doc. 51 at 16) (emphasis omitted).  Daubenspeck argues a "plain reading of this paragraph, in context, leads to the conclusion that Mr. Daubenspeck's upcoming deployment was a consideration in the decision to terminate Mr. Daubenspeck." (Doc. 51 at 16).  Daubenspeck believes that the presence of the word "also" in Lyons's email indicates that Daubenspeck's service obligations were a motivating factor in his dismissal in addition to his poor performance.

Textron fired Daubenspeck on July 27, 2019.  At that time, Daubenspeck had made no sales in the 2019 calendar year.  (Doc. 48 at 7; Doc. 52 at 9).  The parties disagree over how to interpret Daubenspeck's performance in 2019.  Daubenspeck suggests that he "developed a number of sales opportunities in the first and second quarter of 2019 that were prospects for aircraft sales in the third or fourth quarter of 2019." (Doc. 51 at 3).  He suggests that a deal he "had diligently worked on with a colleague since early 2017 booked in August 2019, less than a month and a half after his termination." (Doc. 52 at 10).  He downplays the significance of his lack of sales at the end of 2018 and during the first seven months of 2019 on the ground that he ordinarily made most of his sales in the third and

1   fourth quarter of the year, noting repeatedly that seven of his previous nine sales came in

2   Q3 or Q4.  (*See, e.g.*, Doc. 52 at 9).  Textron states Daubenspeck did not "have any likely

3   prospects in his sales pipeline as of July."  (Doc. 48 at 7).  Textron also notes it fired two

4   other employees, neither of whom were service members, at around the same time for

5   inadequate sales performance.  (Doc. 53 at 7-8).

6         Daubenspeck argues Textron's comparisons between himself and the other Textron

7   sales personnel fired around the same time (neither of whom were service members) are

8   inapt.  One of the fired employees was a Regional Sales Associate who failed to generate

9   enough sales leads.  (Doc. 51 at 11).  Regional Sales Associates at Textron are not

10  responsible for closing sales.  (Doc. 51 at 11).  Daubenspeck argues it is inappropriate to

11  compare a Regional Sales Associate to a Regional Sales Director because "generating sales

12  leads cannot be equated with selling an aircraft."  (Doc. 51 at 11).  The other employee

13  held the same position as Daubenspeck.  But Daubenspeck argues that the comparison to

14  him is unsuitable because the other employee had a worse sales record in previous years:

15  "[the employee] only sold two aircraft in all of 2018, and he only sold one aircraft in 2019,

16  whereas Mr. Daubenspeck sold four aircraft in 2018."  (Doc. 51 at 11).

17                                  **LEGAL STANDARD**

18        Summary judgment may be granted if there is no genuine issue of material fact

19  and the movant is entitled to judgment as a matter of law.  Fed. R.Civ. P. 56(c); *Celotex*

20  *Corp. v. Catrett*, 477 U.S. 317, 321 (1986).  Material facts are those which may affect the

21  outcome of the case and a dispute as to a material fact is "genuine" only if there is

22  sufficient evidence for a reasonable trier of fact to decide in favor of the nonmoving

23  party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  On a motion for

24  summary judgment, the Court draws all reasonable inferences that may be taken from the

25  underlying facts in the light most favorable to the nonmoving party.  *See Matsushita Elec.*

26  *Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).  And, on a motion for

27  summary judgment, "the district court does not assess credibility or weigh the evidence,

28  but simply determines whether there is a genuine factual issue for trial."  *House v. Bell*,

574 U.S. 518, 559–560 (2006).

The moving party has the initial burden of production for showing the absence of any material fact.  *Celotex Corp.*, 477 U.S. at 331.  In circumstances where the *non-moving* party would bear the burden of persuasion at trial, the moving party can satisfy its initial burden in one of two ways: "First, the moving party may submit affirmative evidence that negates an essential element of the nonmoving party's claim.  Second, the moving party may demonstrate to the Court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim."  *Id*.  On the other hand, if the *moving* party bears the burden of persuasion at trial, under *Celotex Corp.*, "that party must support its motion with credible evidence . . . that would entitle it to a directed verdict if not controverted at trial."  *Celotex Corp.*, 477 U.S. at 331 (Brennan, J., dissenting); *Anderson*, 477 U.S. at 251.  In other words, the question is whether a reasonable juror could properly find for the non-movant.  *See Anderson*, 477 U.S. at 252 (citing *Improvement Co. v. Munson*, 14 Wall. 442, 448 (1872)).  If the moving party satisfies its initial burden, the burden of proof shifts to the nonmovant to show that there exists a genuine issue of material fact.

## ANALYSIS

### I.    Legal Standard

USERRA prohibits employment discrimination motivated by uniformed service obligations.  *See Leisek v. Brightwood Corp.*, 278 F.3d 895, 898 (9th Cir. 2002).  An employer violates USERRA if an employee's service status, application for service, or service obligations are a "motivating factor in the employer's action, unless the employer can prove that the action would have been taken in the absence of such membership, application for membership, service, application for service, or obligation for service."  38 U.S.C. § 4311(c)(1).  This statutory language represents a decision by Congress to override a previous Supreme Court decision.

Congress enacted USERRA to strengthen veterans' employment and reemployment

1    rights in response to the Supreme Court's decision in *Monroe v. Standard Oil Co.*, 452

2    U.S. 549 (1981).   *Leisek*, 278 F.3d at 898.   In *Monroe*, the Supreme Court held a

3    predecessor statute to USERRA required that an employee's service status must be the sole

4    motivation for an employer's action.   *Id.* (citing *Monroe*, 452 at 559).   "USERRA replaced

5    the 'sole motivation' test with a more lenient standard that requires only that the

6    employee's military status was a 'motivating factor' in the employer's action."   *Id.* (citing

7    *Sheehan v. Dep't of Navy*, 240 F.3d 1009, 1012-13 (Fed. Cir. 2001); *Gummo v. Vill. of*

8    *Depew*, 75 F.3d 98, 105 (2d Cir. 1996)).

9            Courts applying USERRA use a burden-shifting standard.   *See Huhmann v. Federal*

10   *Express Corp.*, 874 F.3d 1102, 1107 (9th Cir. 2017); *Leisek*, 278 F.3d at 898-9; *Sheehan*,

11   240 F.3d at 1013.   Relying on USERRA's legislative history, courts have applied the

12   burden of proof allocations approved by the Supreme Court in *NLRB v. Transportation*

13   *Management Corp.*, 462 U.S. 393, 401 (1983).[1]   *Leisek*, 278 F.3d at 898-99; *Sheehan*, 240

14   F.3d at 1013.   The employee bears the initial burden to demonstrate, by a preponderance

15   of the evidence, that the employee's military service was a "substantial or motivating

16   factor" in the adverse employment action.   *Sheehan*, 240 F.3d at 1013.   Discriminatory

17   intent can be proved by circumstantial evidence and may be inferred from a variety of

18   factors, "including proximity in time between the employee's military activity and the

19   adverse employment action, inconsistencies between proffered reason and other actions of

20   the employer, an employer's expressed hostility toward members protected by the statute

21   together with knowledge of the employee's military activity," and disparate treatment of

22   service member employees compared with non-service member employees.   *Leisek*, 278

23   F.3d at 900 (citing *Sheehan*, 240 F.3d at 1014).   If the initial requirement is satisfied, "the

24   burden shifts to the employer to prove the affirmative defense that legitimate reasons,

25   standing alone, would have induced the employer to take the same adverse action" without

26

27   _____

     [1] The Ninth Circuit has noted that, although *Transportation Management* has been partially
28   overruled on other grounds, courts continue "to recognize the validity of the *Transportation Management* burden-shifting scheme, because it places the burden of persuasion on the employer as to the affirmative defense only after the employee has first met the requirement of showing that the employer's decision was discriminatory."   *Leisek*, 278 F.3d at 899 n.1.

1    regard to the employee's military service.  *Sheehan*, 240 F.3d at 1014.

2           The evidentiary burdens under *Transportation Management* are different from those

3    in discrimination cases under Title VII of the Civil Rights Act of 1964, as interpreted by

4    the Supreme Court in *McDonnell Douglas Corp v. Green*, 411 U.S. 792 (1973) and

5    subsequent cases, including *Texas Department of Community Affairs v. Burdine*, 450 U.S.

6    248 (1981).  *See Sheehan*, 240 F.3d at 1014.  The *McDonnell Douglas* framework, "while

7    allocating the burden of production of evidence, does not shift the burden of persuasion to

8    the employer."  *Id.* (citations omitted).  USERRA shifts the burden of persuasion and the

9    burden of production.  *See id.*

10          The Arizona Employment Protection Act (AEPA) provides that employees

11   terminated as a result of their service in the armed forces have the right to bring a tort claim

12   for wrongful termination in violation of public policy.  A.R.S. § 23-1501(A)(3)(c)(vii).

13   Under the statute, employers must allow members of "the United States armed forces

14   reserves to take leaves of absence from employment for the purpose of complying with

15   competent orders . . . for active duty or to attend camps, maneuvers, formations or armory

16   drills."  A.R.S. § 26-168(A).[2]  In 2018, the Arizona legislature amended AEPA to provide:

> When ordered to perform active duty or training by the competent orders of
> any state or the United States, members of the national guard or United States
> armed forces reserves shall have the protections afforded to persons under
> federal active duty by the soldiers and sailors civil relief act of 1940 (54 Stat.
> 1178; 50 United States Code App. §§ 501 through 548 and 560 through 591)
> and by the uniformed services employment and reemployment rights act of
> 1994 (108 Stat. 3149; 38 United States Code §§ 4301 through 4333).

21   A.R.S. § 26-168(D); 2018 Ariz. Legis. Serv. Ch. 118 (H.B. 2421).  No court has yet decided

22   what it means for § 26-168 to guarantee "the protections afforded to persons under"

23   USERRA.  Because the legislature amended the statute to bring § 26-168's protections in

24   line with USERRA after *Sheehan*, *Leisek*, and *Huhmann* were decided, the Court infers

---

[2] This Arizona legislature amended this provision in 2021.  *See* 2021 Ariz. Legis. Serv. Ch. 193 (H.B. 2297).  The 2021 amendment largely relates to the way the maximum amount of protect military leave is calculated.  *See id.*  Because the present dispute does not concern the maximum permissible length of Daubenspeck's military leave, the Court need not decide whether the 2021 amendment applies retroactively.  *But cf. United States v. $80,180.00 in U.S. Currency*, 303 F.3d 1182, 1184 (9th Cir. 2002) (noting "the general rule that 'a court is to apply the law in effect at the time it renders its decision'") (quoting *Bradley v. School Bd. Of Richmond*, 416 U.S. 696, 711 (1974)).

that it intended to adopt the *USERRA* balancing framework discussed above. The protections of USERRA and AEPA are thus coextensive and the analysis is identical.

## II. Plaintiff's burden

Daubenspeck bears the initial burden of showing that his upcoming two-month deployment was a "substantial or motivating factor" in Textron's decision to terminate his employment. *See Huhmann*, 874 F.3d at 1108. Daubenspeck makes three arguments to satisfy his burden.

First, he notes the close temporal proximity between when he notified Sperley of his deployment and when Textron terminated his employment. On June 7 and 10, Daubenspeck told Sperley he would be deployed for two months, beginning on August 13. (Doc. 48 at 5). On June 24, Sperley spoke with Lyons. (Doc. 48 at 5). On June 25, Sperley set a goal for Daubenspeck to sell two planes within 30 days. (Doc. 48 at 7). Textron fired Daubenspeck on July 27. (Doc. 48 at 9). Daubenspeck argues the 30-day goal was an unrealistic target Sperley created as a pretextual justification for Daubenspeck's termination.

Textron argues the temporal proximity between the deployment notification and his termination is a coincidence. It notes, "[a]t his deposition, Daubenspeck admitted that by late spring or May 2019 he knew that Sperley was critical of his job performance," and "in May 2019, he actually knew that Sperley didn't think he had enough deals in his pipeline." (Doc. 53 at 3; Doc. 48-1 at 22-23) (emphasis omitted). Textron argues Daubenspeck received the 30-day sales goal not because of the recent notification that he would be deployed, but because it was baked into his annual midyear performance review. (Doc. 48 at 5). Textron notes Sperley also gave a 30-day performance target to a Regional Sales Associate around the same time. That associate was required to generate six leads within 30 days. (Doc. 48 at 11). Textron fired the associate on July 25. (Doc. 48 at 10). On June 25, Sperley told a different Regional Sales Director that Sperley was counting on him to sell a second plane that quarter. (Doc. 48 at 11). Textron fired the other sales director on August 19. (Doc. 48 at 11).

Second, Daubenspeck points to a July 9 email sent by Lyons to Emry Woelk, a

Textron "employee relations specialist," concerning the plan to terminate Daubenspeck's employment if he failed to meet the 30-day goal set by Sperley.  (Doc. 52 at 10).  In the email, Lyons wrote: "Manager set multiple goals including that he expects Josh to sell 2 aircrafts within 30 days (by July 24th) which Josh has not made progress towards.  Josh also sent e-mail to manager on June 10th saying he will be required to join coast guard between August 13th-Octover 11th."  (Doc. 52 at 10).  In his statement of facts submitted in opposition to summary judgment, Daubenspeck italicized the word "also" in the email to indicate that his service obligations were a motivation for his termination in addition to his sales performance.  (Doc. 52 at 10).

Textron suggests that Lyons included the reference to Daubenspeck's service status because "Lyons considered it important that the employee relations team had the complete record for when a termination decision is recommended so that they can evaluate the entire situation.  Given Mr. Daubenspeck's military status, it was particularly important to Lyons that the employee relations team knew that he had received deployment orders."  (Doc. 48 at 8).  They argue "Lyons attached the deployment orders only for Woelk's reference and not because they had any role in the decision to terminate."  (Doc. 48 at 9).

Third, Daubenspeck argues that the tone of his conversations with Sperley changed after he notified Sperley of his deployment.  (Doc. 51 at 14).  Daubenspeck insists "all discussions [he] had with Mr. Sperley regarding sales activity and strategies, until late June, were cordial, upbeat, and positive, with no mention of any repercussions for lack of sales." (Doc. 51 at 14).  But, starting in late June, "the tone of all dialogue with Mr. Sperley turned particularly critical and focused on negative consequences."  (Doc. 51 at 14).

Textron argues Daubenspeck's interpretation of Sperley's response is immaterial. (Doc. 53 at 1-2).  It argues that Daubenspeck's assertion "is insufficient to create a genuine issue of material fact because Daubenspeck has no corroborating evidence, just his subjective impression.  There are no voice recordings to present to a trier of fact."  (Doc. 53 at 2).  Textron correctly notes that the Ninth Circuit has held that an employee's claim that a supervisor used a different tone of voice is insufficient, by itself, to satisfy the plaintiff's initial burden to prove a showing of discriminatory motive under the first prong

of the *McDonnell Douglas* balancing framework.  (Doc. 53 at 2) (citing *Carmen v. North Cent. Ctys. Consortium*, 605 F.3d 740, 753-54 (9th Cir. 2010).  But, unlike in *Carmen*, Daubenspeck's impression of Sperley's tone and nonverbal behavior is not his only evidence of discrimination.  Indeed, it is perhaps the least probative evidence Daubenspeck offers.

The question, therefore, is whether the close temporal proximity, an email referencing Daubenspeck's upcoming service in the context of possible termination, and Daubenspeck's description of Sperley's behavior is sufficient evidence to create a dispute of material fact regarding whether his 2019 deployment was a motivating factor in Textron's decision to terminate his employment.  Viewed in the light most favorable to Daubenspeck, it is.  Textron offers evidence that it was a downsizing at the time, and that struggling sales employees were merely casualties of company-wide trends.  It notes, "Textron terminated 241 employees in 2019 as part of workforce reduction, excluding terminations for performance or retirements."  (Doc. 48 at 11).  Textron may have had motivations for terminating Daubenspeck's employment other than his service status.  But Daubenspeck has sufficient evidence to create a genuine dispute of fact for the jury to decide whether one motivating factor in Textron's decision to terminate Daubenspeck, as opposed to some other employee, was the fact that he would be on leave for two months during the summer and fall of 2019.  Daubenspeck has thus satisfied his initial burden under USERRA.  The burden then shifts to Textron to show there is no dispute that it would have terminated Daubenspeck without regard to his service.

### III.   Defendant's burden

Textron argues "Daubenspeck's military service played no role in the decision to terminate" Daubenspeck's employment.  (Doc. 53 at 1).  This is a stronger position than what Textron must actually show at this point to obtain summary judgment.  That is, Textron is not required to show the military service played *no* role.  Rather, Textron need only show that, even assuming the military service played a role in Daubenspeck's termination, Textron would have made the same decision without considering his military service obligations.  It offers three arguments to show it would have fired Daubenspeck

regardless of his upcoming deployment.

First, Textron notes Daubenspeck had not sold a plane since September 2018, ten months before he was fired.  (Doc. 48 at 5).  The parties vigorously dispute how strong Daubenspeck's sales prospects were at the time of his firing and appear to disagree when Sperley began to communicate displeasure with Daubenspeck's performance to Daubenspeck.  Textron claims Daubenspeck did not "have any likely prospects in his sales pipeline as of July."  (Doc. 48 at 7).  In his Response in Opposition to the Motion for Summary Judgment, Daubenspeck discusses at length the sales prospects he felt he had in the wings at the time he was fired.  (Doc. 52 at 3).  At the core of the disagreement, however, the parties seem to agree that, despite Daubenspeck's efforts, in the two months leading up to Daubenspeck's termination, Sperley clearly communicated displeasure with Daubenspeck's lackluster sales performance.  (Doc. 48-1 at 22)

Second, Textron points out it gave two other employees in Arizona, a Regional Sales Associate and a Regional Sales Director, quotas similar to Daubenspeck's and fired those employees around the same time.  Sperley told the associate to produce six leads for aircraft sales in thirty days.  (Doc. 53 at 7-8).  After he failed to do so, Textron fired the employee.  (Doc. 53 at 8).  Sperley told the sales director in June that he wanted another sale.  (Doc. 48 at 11).  The other sales director was fired three weeks after Daubenspeck.  (Doc. 48 at 11).  While these comparisons have some weight, Daubenspeck argues the comparisons may be inapt.

Daubenspeck argues the comparison to the sales associate is inapposite because "generating sales leads cannot be equated with selling an aircraft."  (Doc. 51 at 11).  He also suggests the associate had been a poor performer in the past.  (Doc. 51 at 14; Doc. 52-5).  Daubenspeck seeks to distinguish himself from the other sales director by pointing out that the other sales director "had very poor sales results in 2018."  (Doc. 52 at 14).  The other sales director sold two planes in 2018 and one in 2019, (Doc. 52 at 14); Daubenspeck sold four planes in 2018 and none in 2019.  (Doc. 52 at 9; Doc. 48 at 2).  Moreover, Daubenspek notes Sperley said on a call with Lyons that the other director would be let go

- 12 -

as a result of reduction, not a termination due to performance.  (Doc. 52-3).[3]  And Sperley and Lyons had discussed whether it would be appropriate to move the other director to another role due to market conditions.  (Doc. 52 at 15).  Daubenspeck alleges he was not given similar consideration.  (Doc. 51 at 11).

Third, Textron argues it was merely engaged in company-wide downsizing at the time.  It notes, "Textron terminated 241 employees in 2019 as part of workforce reduction excluding terminations for performance or retirements."  (Doc. 48 at 11).  Heading *G* of Textron's Reply in Support of its Motion for Summary Judgment says, "Textron terminated all of the regional sales directors and associates covering Arizona, not just Daubenspeck." (Doc. 53 at 7).  If it is true that Textron fired *every* employee in those positions in the state, that would be highly probative of their argument that Daubenspeck's service status played no role in Textron's decision.  But Textron failed to provide admissible evidence to support its factual assertion and did not make this assertion in its statement of facts.  Thus, Daubenspeck was not afforded an opportunity to dispute it.  The record, then, does not support the Court using it as a basis for summary judgment.[4]

## IV.   Summary judgment is not appropriate

Taking all the facts in the light most favorable to Daubenspeck, the Court finds summary judgment is not appropriate.  Because Daubenspeck satisfied his initial burden, the burden of persuasion shifts to Textron.  Where, as here, the "the *moving* party would bear the burden of persuasion of trial, that party must support its motion with credible evidence . . . that would entitle it to a directed verdict if not controverted at trial."  *Celotex Corp.*, 477 U.S. at 331 (Brennan, J., dissenting).

Textron argues Daubenspeck was fired, just like two other Arizona salespeople, due to inadequate sales performance amid company-wide layoffs.  Nevertheless, a reasonable

---

[3] However, Textron ultimately terminated the other regional sales director due to performance.  (Doc. 47 at 9).
[4] Interestingly, if Textron did indeed fire all such employees, it would lend credence to the notion that the sales quotas given to Textron employees were pretextual.  But rather than demonstrating pretext for firing Daubenspeck on the basis of his service status, it would show that the quotas were pretext for Textron clearing house within the state (which would not support either of Daubenspeck's claims in the present litigation).

factfinder could interpret the close proximity between Daubenspeck's deployment and his termination, along with the July 9 email from Zachary Lyons, showed Daubenspeck was chosen for termination because he would be taking two months' leave.  And assuming Daubenspeck's deployment was a motivating factor in Textron's decision to terminate him, rather than some other Textron employee, Textron has not established as a matter of law that it would have made the same decision regardless.  Daubenspeck's claims must proceed to trial.  *Cf. Sheehan*, 240 F.3d at 1014.

This matter is now ready for trial.

Accordingly,

**IT IS ORDERED** Defendant's motion for summary judgment (Doc. 47) is **DENIED**.

**IT IS FURTHER ORDERED** all Motions in Limine are due no later than **April 19, 2022**. Responses are due no later than **April 29, 2022**.  No replies are permitted unless ordered by the Court. Prior to filing any Motion in Limine, the parties must confer and discuss the contents of each proposed motion.  No Motion in Limine shall be filed if opposing party does not dispute the relief requested.

**IT IS FURTHER ORDERED** the Joint Proposed Pretrial Order is due no later than **May 2, 2022**.

**IT IS FURTHER ORDERED** the parties shall review the Court's standard Juror Questionnaire (available on the Court's website) and each party is to file **NO MORE THAN FIVE PROPOSED QUESTIONS** to be added to the standard Juror Questionnaire no later than **May 2, 2022**.  Each proposed question shall stand alone and shall not contain sub-parts.

**IT IS FURTHER ORDERED** the parties shall file a very brief Joint Statement of the Case, that will be incorporated into the Juror Questionnaire, no later than **May 2, 2022**.

**IT IS FURTHER ORDERED** the parties shall file a second Joint Statement of the Case, of no more than two short paragraphs that will be read to the jury, no later than **May 16, 2022**.

1        **IT IS FURTHER ORDERED** no later than **May 16, 2022**, the parties shall file
2  and submit via email (silver_chambers@azd.uscourts.gov) in Word format proposed Jury
3  Instructions in compliance with the procedures available on the Court's website, including
4  but not limited to: 1) a *joint* set of proposed jury instructions where they agree; 2) a separate
5  set of instructions (one for each party) where the parties do not agree; and 3) legal authority
6  supporting all proposed instructions whether the parties agree or not. Where the parties do
7  not agree, the opposing party shall clearly state its objection to the proposed instruction
8  and the proponent of the instruction shall provide a response in support of the proposed
9  instruction.

10        **IT IS FURTHER ORDERED** the parties shall jointly file a proposed form of
11  verdict, or if the parties do not agree, they are to separately file proposed forms of verdict
12  no later than **May 16, 2022**.

13        **IT IS FURTHER ORDERED** no later than **May 16, 2022**, the parties shall deliver
14  to chambers excerpts of the deposition testimony they propose to present as witnesses at
15  trial, in compliance with the procedures available on the Court's website (found in
16  Deposition Designation Procedure for Judge Silver).  The Plaintiffs are to highlight in
17  yellow the portions they wish to offer. and the Defendants are to highlight in blue those
18  portions they wish to offer.  If either party objects to any proposed testimony, a specific
19  and concise objection (e.g., "Relevance, Rule 402") shall be placed in the margin adjacent
20  to the proposed testimony.  The party proposing the testimony to which there is an objection
21  is to respond to the objection that has been placed in the margin by the objecting party.

22        **IT IS FURTHER ORDERED** a final pretrial conference is set for **<u>June 8, 2022 at
23  10:00 a.m.</u>** at which time the Court will review with counsel the Juror Questionnaires.  The
24  parties shall meet and confer prior to the pretrial conference regarding the Juror
25  Questionnaires and email to the Courtroom Deputy no later than noon on **June 7, 2022** a
26  list of the jurors they agree should be stricken for cause, and any objections to jurors they
27  do not agree should be stricken for cause.  **The parties shall not file this list.** The Court
28  will rule on any disputed jurors at the final pretrial conference.

1        **The parties will be supplied a disk containing the questionnaires approximately**

2 **one week prior to the final pretrial conference.  Counsel shall bring a copy of the**

3 **questionnaires to the conference for review.  Counsel are required to return the disk**

4 **to the Courtroom Deputy and destroy all copies of the questionnaires no later than**

5 **the last day of trial.**

6        **IT IS FURTHER ORDERED** trial to a jury is set for **<u>June 15, 2022 at 8:30 a.m.</u>**

7 Estimated length of trial is 3 days.

8        **IT IS FURTHER ORDERED** the parties shall comply with the Exhibit Procedures

9 found on the Court's website at www.azd.uscourts.gov / Judges' Information / Orders,

10 Forms & Procedures for Hon. Roslyn O. Silver.

11        Dated this 12th day of October, 2021.

12

13

14

                                    Honorable Roslyn O. Silver

15                                     Senior United States District Judge

16

17

18

19

20

21

22

23

24

25

26

27

28